STATE OF LOUISIANA
v.
DERRICK K. RICK.
No. 2007 KA 1514.
Court of Appeal of Louisiana, First Circuit.
February 8, 2008.
Not Designated for Publication
SCOTT M. PERRILLOUX, DONWALL, PATRICK WALSH DUNN, Amite, La, Attorneys for Appellee, State of Louisiana.
MARY E. ROPER, Baton Rouge, La, Attorney for Defendant/Appellant, Derrick K. Rick.
Before: WHIPPLE, GUIDRY and HUGHES, JJ.
WHIPPLE, J.
The defendant, Derrick K. Rick, was originally charged by grand jury indictment with two counts of first degree murder, in violation of LSA-R.S. 14:30. The defendant pled not guilty as to both counts. Following a trial by jury, the defendant was found guilty as charged. The jury was unable to reach a verdict during the penalty phase. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence as to both counts, to be served consecutively. The defendant appeals, challenging the sufficiency of the evidence and the trial court's denial of his pro se motions to withdraw his trial counsel. For the following reasons, we affirm the convictions and sentences.

STATEMENT OF FACTS
During the early morning hours of April 13, 2001, Judy Nance discovered the bodies of victims Korie Newman (Nance's daughter) and Alonzo McCrory, Jr. just outside of McCrory's residence located on McCrory Lane in Ponchatoula, Louisiana. Both victims died as a result of gunshot wounds to the head. The defendant, Newman's former boyfriend and the father of her child, became a suspect in the matter. The defendant was questioned at approximately 4:00 a.m. on April 13, 2001. According to the statement given to the police by the defendant, prior to the murders, the defendant observed Newman and McCrory's vehicles parked outside of McCrory's residence. The defendant looked through the windows of the residence and observed Newman and McCrory having sexual relations. The defendant walked to his cousin's nearby residence and retrieved a gun. The defendant walked back to McCrory's residence and waited for the victims to exit the residence. After the victims exited the residence, the defendant shot Newman first, and she immediately fell to the ground. As McCrory began to flee toward the front door of the residence, the defendant shot him. The defendant approached McCrory's fallen body and saw that he was still moving. The defendant shot him again. The defendant discarded the weapon in a nearby alligator pond.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant argues that there was insufficient evidence to support the first degree murder convictions, and that he should have been convicted of manslaughter. Specifically, the defendant argues that there was no evidence of specific intent to kill. The defendant argues that he had a mental breakdown or "snapped" due to sleep deprivation, medication and caffeine pill intake, and the observation of Newman and McCrory (whom the defendant described as one of his best friends) engaging in sexual relations. The defendant contends that he lost self-control and reacted without conscious intent.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. State v. Wright, 98-0601, p. 2 (La. App. 1st Cir. 2/19/99), 730 So. 2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So. 2d 1157, XXXX-XXXX (La. 11/17/00), 773 So. 2d 732.
The crime of first degree murder, in pertinent part, is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. LSA-R.S. 14:30A(3). Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Although intent is a question of fact, it need not be proven as a fact. Instead, it may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625, p. 4 (La. App. 1st Cir. 5/10/96), 673 So. 2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So. 2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Seals, 95-0305, p. 6 (La. 11/25/96), 684 So. 2d 368, 373, cert. denied, 520 U.S. 1199, 117 S. Ct. 1558, 137 L. Ed. 2d 705 (1997).
In accordance with LSA-R.S. 14:31A(1), manslaughter is a homicide which would be a first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. "Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]" See LSA-R.S. 14:31A(1). "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which tend to lessen the culpability. State v. Rodriguez, 2001-2182, p. 17 (La. App. 1st Cir. 6/21/02), 822 So. 2d 121, 134, writ denied, 2002-2049 (La. 2/14/03), 836 So. 2d 131. Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. Rodriguez, 2001-2182 at p. 17, 822 So. 2d at 134.
Nance testified that her daughter (victim Korie Newman) began a relationship with the defendant in 1999. In August of 2000, Newman and the defendant had a child. According to Nance's testimony, the defendant was controlling during the relationship. Newman and the defendant lived together for approximately eight months. Around February of 2001, Newman left the defendant and began living with her mother. Nance further testified that the defendant broke into her home on two separate occasions and took the child without notice. On the second occasion, the child had bruises upon his return. Prior to her death, Newman sought, but had not yet received, a restraining order against the defendant.
On the night before the murders, Nance was expecting Newman to return home from visiting McCrory by 11:30 p.m. When Newman did not return, Nance went to McCrory's residence to look for her. Nance first observed McCrory's body slumped over on the porch of the residence. She then saw her daughter's body lying out in the yard.
According to McCrory's father, McCrory began a relationship with Newman approximately six weeks after Newman left the defendant. Newman and the defendant had previously resided together at a rental home located on McCrory Lane. McCrory's residence was located between 100 and 150 yards from the rental home. The defendant's cousin, Christopher Ratliff, was renting the home at time of the offenses.
The defendant's brother, Charlie Rick III, and his girlfriend, Carla Strunk, described the relationship between the defendant and Newman as "off and on." According to Strunk, the defendant had previously threatened to hurt Newman. The defendant's brother also stated that the defendant and Newman had ended the relationship at least one month prior to the murders. When questioned regarding an automobile accident that the defendant had been involved in on April 11, 2001, he confirmed that the defendant had been taken to the hospital and discharged with a laceration on one of his hands.
The defendant's cousin, Ratliff, and several others resided in the rental home on McCrory Lane (including state witnesses Dallas Chaisson, Amanda Childress, Brandon Gendron, and Christie Smith). Smith responded affirmatively when asked during cross-examination if the defendant had been prescribed hydrocodone and lortab for injuries to his hand received in the car accident that he was involved in on April 11, 2001. On April 12, 2001, near 11:00 p.m., the residents of the rental home got dressed to go out for the night. The defendant was with them at the time. The defendant asked to be dropped off at the end of McCrory Lane, near the Weinberger intersection. Smith gave the defendant the house key, and they left after dropping him off.
Within an hour, the defendant contacted Smith and asked her to come pick him up, stating that he did not feel well. The defendant also told Smith that he thought he had taken too many "yellow jackets," otherwise referred to as energy pills. When Smith and others went back to pick up the defendant, he was asleep. Ratliff shook the defendant to awaken him, and the defendant jumped up in fear. The defendant told Smith to place her hand on his chest to feel the rate of his heartbeat. Smith noted that the defendant's heart was beating fast. After the defendant stated that he was okay, the defendant and group left and loitered at a Mart parking lot before returning to McCrory Lane. The defendant seemed fine and acted normally. When they arrived back at McCrory Lane, the police, ambulances, and others were there. At that point, the defendant told the group, "I've been with y'all tonight no matter what." Smith responded, "Okay."
Detective Gary Baham of the Tangipahoa Parish Sheriffs Office and Jerry McDowell (a former investigator with the Tangipahoa Parish Sheriffs Office) questioned the defendant. Detective Baham began questioning the defendant at 4:00 a.m. on April 13, 2001, and Mr. McDowell spoke to the defendant at approximately 7:00 a.m. Both officers indicated that the defendant appeared sober and was lucid. The defendant did not testify during the trial.
On appeal, the defendant argues that the evidence shows he acted only in sudden passion or heat of blood. However, we note that the defendant walked approximately 150 feet away from McCrory's residence to retrieve a gun and then waited for a few minutes for the victims to exit the residence. There was no evidence to indicate the quantity, if any, of prescription drugs the defendant actually consumed. Instead, the testimony presented at trial shows that the defendant did not appear to be under the influence of drugs within a close time frame of the murders.
In reaching its verdict, the jury concluded that the evidence presented herein excluded every reasonable hypothesis of innocence. The jury further concluded that there was insufficient evidence of manslaughter. On review, we find that the record supports the jury's conclusions. The defendant failed to establish by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood." See State v. Maddox, 522 So. 2d 579, 582 (La. App. 1st Cir. 1988). Viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could find that the essential elements of first degree murder were proven beyond a reasonable doubt.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the defendant contends that the trial court abused its discretion in denying his motion for removal of his public defender as his trial counsel. The defendant argues that his appointed counsel failed to meet with him at the prison or to accept his telephone calls. The defendant further claims that one of his attorneys accused him of being guilty and wasting time by going to trial. The defendant contends that the lack of effective representation and irreconcilable differences caused animosity, and that he ultimately filed complaints with the Louisiana State Bar Association.
Louisiana Constitution article 1, section 13 provides in pertinent part that "[a]t each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment." Likewise, the Sixth Amendment to the United States Constitution carries such a guarantee.
As a general proposition, a criminal defendant has the right to counsel of his choice. If a defendant is indigent, he has the right to court-appointed counsel. An indigent defendant does not have the right to have a particular attorney appointed to represent him. An indigent's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. State v. Leger, XXXX-XXXX, p. 43 (La. 7/10/06), 936 So. 2d 108, 142, cert. denied, ___ U.S. ___, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007); State v. Bonit, XXXX-XXXX, p. 5 (La. App. 1st Cir. 2/10/06), 928 So. 2d 633, 637, writ denied, XXXX-XXXX (La. 3/16/07), 952 So. 2d 688.
The question of whether to allow counsel to withdraw largely rests within the discretion of the trial judge, and his ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. State v. Bridgewater, XXXX-XXXX, p. 21 (La. 1/15/02), 823 So. 2d 877, 896, cert. denied, 537 U.S. 1227, 123 S. Ct. 1266, 154 L. Ed. 2d 1089 (2003).
In assessing a claim of ineffectiveness, a two-pronged test is employed. The defendant must show that (1) his attorney's performance was deficient; and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The error is prejudicial if it was so serious as to deprive the defendant of a fair trial or "a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. In order to show prejudice, the defendant must demonstrate that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; State v. Felder, 2000-2887, pp. 10-11 (La. App. 1st Cir. 9/28/01), 809 So. 2d 360, 369-70, writ denied, XXXX-XXXX (La. 10/25/02), 827 So. 2d 1173. Further, it is unnecessary to address the issues of both counsel's performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components. State v. Serigny, 610 So. 2d 857, 860 (La. App. 1st Cir. 1992), writ denied, 614 So. 2d 1263 (La. 1993).
A claim of ineffectiveness is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. State v. Miller, 99-0192, p. 24 (La. 9/6/00), 776 So. 2d 396, 411, cert. denied, 531 U.S. 1194, 121 S. Ct. 1196, 149 L. Ed. 2d 111 (2001). In the instant case, we find that the record discloses the evidence needed to decide the issue of ineffective assistance of counsel.
Herein, the defendant filed two pro se motions "to withdraw appointed counsel." The hearing on the first motion took place on December 16, 2003, approximately two years before the trial took place. At that time, the defendant noted that the appointed counsel met with him that November and discussed the defense strategy. The defendant stated in part, "he's ... more-or-less saying I'm guilty." The trial court noted that the attorney representing the defendant had been before the court in the past and always did a good job. The trial court found no reason to remove the appointed counsel. The defense attorney stated that he had not advised the defendant of any theory of defense. The defendant provided the defense attorney with a list of potential witnesses, and the defense attorney was in the process of attempting to locate them. The defense attorney further stated that he had spent several hours researching the defendant's case and would be filing a motion to suppress the evidence. The trial court denied the motion.
The hearing on the second motion took place on June 13, 2005. The defendant stated that he did not want to be represented by the Public Defender's Office, specifically stating that he wanted to "fire the whole public defender's office." The defendant responded negatively when the trial court asked him if he had another attorney. The defendant stated that he did not trust the public defender's office enough to discuss his case with them. The appointed counsel, a different public defender than the one present at the first hearing, stated that the public defender's office had been very diligent in filing motions and representing the defendant in his best interest. The public defender added that he knew members of the defendant's family. The trial court noted that the public defenders had filed several motions on the defendant's behalf. The trial court denied the second motion.
Based on our review of the record and the arguments raised herein, we find that the defendant fails to show either that his counsels' performance fell below an objective standard of reasonableness or that his counsels' alleged inadequate performance prejudiced him to the extent that his trial was rendered unfair and the verdicts suspect. Thus, we find no abuse of the trial court's discretion in denying the motions to dismiss counsel.
This assignment of error also lacks merit.

CONCLUSION
For the above reasons, the defendant's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.